This case concerns oxygen absorbers. For many years before the McKinney invention, people had been trying to improve the effectiveness of oxygen absorbers. They tried modifying all sorts of things, the proportions, pH, using different salts or liquids, but nobody, as far as we know, until McKinney, had ever focused on selecting the type of iron powder as a way to improve the effectiveness of the absorber. McKinney discovered that particulate and yet electrolytic... What does this have to do with your appeal? No, I just wanted to give some background. We don't need any background. Pactiv, the accused infringer, uses an admittedly different but new iron powder in their oxygen absorber. These nutrients are fine. An iron powder that did not exist at the time the invention was made, which was invented in 2005, and... During the prosecution, Multisorb disavowed iron that was not electrically reduced. And Pactiv's nutrifying iron is not electrically reduced. Is that right? Nutrifying is not electrically reduced, but we did not disclaim all electrolytically reduced iron. We only disclaimed Pentler's hydrogen annealed iron. Well, you talk... I believe your disclaimer is about... Isn't it the timing? Isn't it to the nature of the timing of whether or not something is reduced prior to or after annealing? I mean, isn't that the nature of your disclaimer? The disclaimer strictly focused on whether Pentler's hydrogen annealed iron, which was... And the court did construe the particular annealed or electrically reduced annealed iron as being subsequently annealed. However, we are not proceeding under a case of literal infringement, but rather the doctrine of equivalence. So PERI, which is particular annealed or electrically reduced iron, we call it PERI for short, is equivalent to nutrifying. And nutrifying, which did not exist, and the manufacturer has called chemically identical to electrolytic iron. If it didn't exist and it wasn't foreseeable, there can't be a disclaimer. Your disclaimer was, among other things, the iron is electrolytically reduced iron, which has been subsequently annealed. Is nutrifying electrolytically reduced iron, which has been subsequently annealed? No, Your Honor. If it was, we would be proceeding under a literal infringement. Is it annealed at all? No, Your Honor. Well, I don't understand how you can proceed under the doctrine of equivalence in light of prosecution history. The SOPL, how can you proceed under the doctrine of equivalence when you've limited yourself to electrolytically reduced iron that has been subsequently annealed? I mean, that seems to be the crux of it. You say there's absolutely no teaching in Pemsler that the hydrogen-annealed iron has been electrolytically reduced before it has been hydrogen-annealed. It seems like subsequent annealing is a critical facet of your claims as articulated in the prosecution history. And so if nutrifying has not been subsequently annealed, I don't know how you can get that back. Well, Your Honor, because the scope of the disclaimer was only for Pemsler's hydrogen-annealed iron. The district court held that Malteser was merely differentiating its product from Pemsler's product. Not that there was a disclaimer in their claim construction decision. And that part of the claim construction has not been appealed in this case. So therefore, the district court holding that Malteser merely differentiated Pemsler's hydrogen-annealed iron from Harry Stand's. I understood the prosecution history to center on the timing of when annealing takes place. And that there the applicant argued that annealing must take place after electrolytic reduction. And now it seems like you're arguing something different here. Your Honor, that would be true if we were proceeding under a literal infringement theory. But we're proceeding here under the doctrine of equivalence under a theory that in the manufacture of both the accused iron powder and the claimed iron powder has held to be chemically identical. This kinutrifying did not exist, nor was it foreseeable in 1995. Therefore, there isn't a disclaimer. I don't understand. So now you're saying that it doesn't matter when the annealing takes place? Correct, Your Honor, because we're proceeding under the entire thing is... But in the prosecution history, you argued that it has to take place after the electrolytic reduction. So you disclaimed the timing of the annealing. Correct. And you gave that up to the public. Any annealing that takes place prior, that's what you gave to the public. And now it seems like you're trying to reclaim that. Well, Your Honor, I'm not attempting to reclaim annealing. I'm simply attempting to... It's not annealing. You're trying to reclaim annealing before the electrolytic reduction. Well, Your Honor, the scope of the disclaimer was merely for hydrogen annealed iron. And this argument that we gave up everything was not argued by passive during summary judgment. And under this court case law, arguments that were not made to the district court are not preserved for review by this court. All right. It seems to me that the reasons that I articulated to you are the very same reasons that the court bases decisions. Those were not the arguments advanced by passive during summary judgment. So you're saying they waived those arguments? Yes. Yes, Your Honor. Those arguments are waived because passive merely made a distinction based on hydrogen annealed iron during summary judgment as part of its disclaimer argument. Wait a minute, though. You've got claims for tortious interference, false marking, Lanham Act. Tortious interference requires unjustified interference by the defendant. Let me go through these all and then lump them. False marking requires purposeful deception. Let's lump those two together before I go to Lanham. Given the nature of the arguments that we've just had here, why can't they rely on their counsel's advice in good faith? Because that would be bad faith. Your Honor, there's simply no evidence except for that passive is presented that they relied on attorney advice except for a conclusory statement that they did. There were no affidavits submitted by these attorneys that allegedly gave advice. There is nothing in any discovery detailing what this advice was. So, therefore, mere conclusory statements are not sufficient to award summary judgment. And as the non-moving party, Halstead-Serve, of course, is entitled to all inferences in its favor. You have testimony by Cargill under the Lanham claim that they didn't care whether the patent was valid or not. So, since the deception has to be material, and that is it has to be likely to influence purchasing decisions, and since Cargill says they don't care, how do you have a Lanham claim? Well, we had a Lanham claim because of the other parts of the deposition testimony by Cargill, which raised an issue of fact for trial. Cargill testified that they would not consider testing or reviewing Malteser's product at all unless Malteser identified them against Patrick's patent. Cargill also testified that they would— Well, that's not exactly what he said. He said, I don't think I would. He testified more than once, Your Honor, that they would not look at Malteser's product at all. Yes, but even if you're right, and even if all inferences went in favor of your articulation of Cargill's testimony, the test requires a substantial portion of Patrick's customers being deceived. And you presented evidence of one potential customer, if everything is in your favor. How does that meet your obligation of showing a substantial portion of Patrick's customers? Your Honor, I don't believe that we included this in the record, but Cargill is the major customer. Well, if it's not in the record, how are you arguing it? Well, it's in the underlying trial court record. It's not before this court. And I just wanted—because I don't have a joint appendix to give you on that. But Cargill is the most—the major customer. They supply Walmart. But what's the competitive harm that you suffered as a result of the Lanham Act claims? The competitive harm—first, I want to advise the court that we are on a stay of damages discovery. Discovery has been bifurcated. However, we were damaged because Cargill—if I'd like to just respond to that question, I see that my time is up. But then, with Cargill, we were unable to even bid on our oxygen absorbers. They refused to even look at multi-absorbers products because they were so spooked by Pat's patents and the comments that Pat did make towards them. Okay. Thank you. These are from the opposing counsel. Thank you. Mr. Shulman? May it please the court? There are two independent dispositive patent issues in this case. Each presents textbook examples of doctrinal equivalence limited by prosecution history estoppel. First, argument-based estoppel related to the iron limitation and amendment-based estoppel related to the salt limitation. Either one provides an independent ground for affirming summary judgment of non-infringement below. I want to address what Ms. Friedman said about the disclaimer being only about annealing. Let's take a step back to the record, page 585, where the applicant says, the iron which forms the subject matter of the present invention is electrolytically reduced iron, which has been subsequently annealed. The reason for that was because the applicant had found two pieces of prior art, Yoshikawa, which was electrolytically reduced iron on its own, and Penzler, which was annealed iron, and said, you put these two things together and you get particulate annealed electrolytically reduced iron. Multisort wasn't just disclaiming annealed iron when it said, you can't just put those two things together and get it. You have to do one, electrolytically reduced iron, and then subsequently annealed. So to say that the disclaimer was only to the annealing ignores the fact that there was a combination of references here. Electrolytically reduced iron and annealed iron. In addition to that, the specification identifies hydrogen reduced iron, which the accused iron is. Neutrofine is hydrogen reduced iron. The specification in two places, including on page 160, says that hydrogen reduced iron existed. It was simply too slow. So we have a disclaimer. Not only hydrogen reduced iron. We know that particulate electrolytically reduced iron cannot, particulate annealed electrolytically reduced iron, cannot cover just hydrogen reduced iron, because that was already in the prior art. We know it can't cover electrolytically reduced iron alone, because that was the Yoshikawa reference. We know it's not annealed iron alone, because that was the Penzler reference. We know it's not even electrolytically reduced iron that has been annealed at the same time or annealed before, because that was the combination the examiner said was obvious. It is only, the only thing that this claim covers, is electrolytically reduced iron, which has been hydrogen annealed. Now, Multisorb argues that neutrofine was not foreseeable under the Festo exemption for foreseeability. But foreseeability was the patentee's burden, and it requires more than simply saying the accused equivalent did not exist at the time. And on page 42 of their brief, they make their argument for foreseeability. And they underline one sentence. And that one sentence is to emphasize that there was no equivalence because neutrofine did not exist at the time. That is their only evidence that neutrofine is not foreseeable. What's their case law on that particular issue? Well, the Honeywell case is directly on point. In Honeywell, the claim was to guide veins. And there was a prior art which used a switch and some sort of algorithm, which was known. And some ten years after the amendment to guide veins was made, the accused came along and used a switch, but they used guide veins. They essentially did what the guide veins had always done, had done independently. And there, the court said, notwithstanding the fact that a switch plus guide veins did not exist at the time, they said the know-how to put those two things together certainly existed. And there's a quote in Honeywell, page 1314 of the Honeywell decision, which is directly on point. And this court said, foreseeability does not require that the accused product or process be foreseeable, nor that any equivalence exist at the time. Rather, foreseeability only requires that one of ordinary skill in the art would have reasonably foreseen the proposed equivalent at the pertinent time. So if we're talking about the accused neutrofine hire, the patent on neutrofine is in the record. This is at 3284 to 3289. And we'll take a look at that patent also on page 42 of this brief to talk about neutrofine. And neutrofine has two lines in the entire patent which explain how that hydrogen-reduced iron was produced and got essentially this better morphology. It says it was treated at, quote, somewhat higher temperature and or somewhat longer heating times. You essentially turn the knob on the oven. That was within the skill of one of ordinary skill in the art at the time. Can I ask you a procedural question? Certainly. Are all of the claims, patent claims that are at issue in this case, were they all subject of the reexamination that has already taken place, the BTO? No, Your Honor. That's what I'm trying to figure out, the claims. The BTO has struck all of those claims and that's already been affirmed by us? Those are pactive affirmative claims. These are multipurpose patents that they have certified as counterclaims. Okay. So five of the pactive patents have been rejected by the BTO and then that rejection was affirmed. There are two additional patents that were put into reexamination at a separate time. Those were also rejected by the BTO. Those are, in fact, up before the court right now. Okay. But they are completely different patents than the ones on the floor here. So, because neutrofine was foreseeable at the time and does not fall within any other FASTA exception, and was hydrogen-reduced iron, which was disclaimed, it falls within the prosecution history estoppel and cannot be found to be infringing under the doctrine of equivalence. Turning to the SALT, the SALT means claim. On its face, multisource claim construction creates multiple inconsistencies. If it wanted SALT to mean acid, it could have written acid. If it wanted SALT to mean a source of electrolytes, it could have said a source of electrolytes. Instead, it used the word SALT to describe a class of chemicals, every one of which in the patent, and this is at A161, column 4, lines 9 through 17, every one of which is an actual salt. And multisource 30B6 witness testified to this deposition at page 1221 of the record, lines 2 through 6. Every one of those compounds is a salt created by the combination of an acid and a base, which is the district court's point of instruction. The district court reviewed the prosecution history, including that deposition testimony, extrinsic evidence and dictionaries, which is entitled to deference under TEBA, and determined that the most logical definition of salt is from the Handbook of Chemistry and Physics. That's at page 19 of the district court's decision. The Handbook of Chemistry and Physics is at 922 of the record. That's important because when multisource witness was asked, where would one of ordinary skill in the art for oxygen absorbers look to find the definition of salt, at page 1221 of his deposition, he said the Handbook of Chemistry and Physics. Sorry, I keep mis-citing that. He talks about every one of the salts in the specification being an actual salt, and he's explaining the instructions at 1256 to 1259 of his deposition. So multisource witness says, where do you look? He looked at the Handbook of Chemistry and Physics. The court looked at the Handbook of Chemistry and Physics and found that salt is the product of acids and bases. The accused product does not use a salt. It uses malic acid. And multisource came to the patent office and said, we want salt means. And the examiner said, salt means is broad. It's too broad. In fact, it's indefinite, and it's, quote, and this is at page 569 of the record, beyond the scope of material in your invention. And multisource said, yes, but we want it anyway. At page 578 of the record, they said salt means is entired, we are entitled to claim a large, claim it broadly and get a large range of equivalents. The patent office said, it's very broad, so broad I don't even know where it ends. Multisource said, yes, we want it broad. An interview was conducted, and they removed the word means, it just went down to salt. Between salt means and salt are things which might function like salt but are not salts, such as malic acid. Because multisource disclaims things that function like salts but are not salts, things which might create an electrolyte, like an acid, they cannot reclaim those under the doctrine of equivalence. I want to make one brief point on the argument that active waves, anything other than hydrogen is healing. Test, test, one, two, three. Check one, check two. Check one, two, three. Check one, two, three. Check one, two, three. Check. Pause for a second. Let me figure out what's going on. A lower spate. Practice electrolytism before the argument. Okay. Multisource. Turn it up. And it could exist. Morning corn. Okay. Oh, yeah. Okay. Okay. All right. Can we keep going? Yep. Good. Please proceed. I think you said one final thing, which made me happy. So keep going. What's your final thing? That's where you left off. That's my recollection of it. Go with it. I will not contest final. The waiver argument. There was an argument made by Ms. Friedman. The PACTIF waived anything other than arguing about hydrogen and healing. Pages 21, 35 to 37 of the record is PACTIF summary judgment brief. On those three pages, PACTIF did address hydrogen reduction, as well as 499 of the record in PACTIF's Markman brief. It raised hydrogen reduction. Finally, Ms. Friedman claimed there was no evidence relating to that advice of counsel in the record. Pages 1480 to 1482 was the deposition testimony of Gary Dalduca, referring to the fact that the marking was based on the advice of counsel. So while there was no affidavit from counsel, there was certainly deposition testimony of the witness reflecting the good faith belief based on advice of counsel. Both parties mark, actually. In fact, Multisorb for years was PACTIF's supplier, and while it was PACTIF's supplier, it did mark with the patent number until it ceased to be PACTIF's supplier and then claimed that it was deceptive. There are no other questions? Well, I do have one. It's a throwaway, really. You would agree that if you prevail in your substantive argument that the other claims necessarily go away, that is, false marking and so on, because they require bad faith? Well, Your Honor, back to Judge Moore's question. Those claims relate to the affirmative patent claims of PACTIF earlier asserted. So prevailing on Multisorbs' patent claims here really don't impact the business tort claims. The business tort claims fail for a number of other reasons, not the least of which is bad faith and the fact that of all of the four customers of PACTIF. Well, what I'm saying is you can't have bad faith if you have a reasonable belief and if, in fact, you're correct, you obviously do have a reasonable belief. That is absolutely true, Your Honor, even if you don't have a reasonable belief. Reasonableness of the belief isn't enough. Under Globetrotter and Mecone Gaming, you need actual knowledge that the statement is false, not even a belief that it might be false, and that's assuming that you've got objective baselessness, which is you don't even get this objective bad faith unless you do. Okay. Thank you. We have some rebuttal time. Ms. Friedman, please proceed. I'd like to address a couple of the points brought up. A2134-2135 contains PACTIF's argument on estoppel, and I leave that to the court to review whether they consider PACTIF has waived the argument. PACTIF also never argued in the district court that neutrofine was foreseeable, so, again, that argument would be waived. Well, it's not a matter of argument. It's not a matter of whether it's foreseeable. Isn't it just a matter of whether it amounts to a hydrogen-reduced salt, which the patent itself, hydrogen-reduced, am I getting it wrong? Iron. Iron. I mixed up the two, sorry. Hydrogen-reduced iron. I mean, the patent itself expressly acknowledges that those are in the prior art, right? And isn't neutrofine just a hydrogen-reduced iron? Neutrofine is a, as said by its manufacturer, neutrofine is a new generation of hydrogen. I claim lots of things are new. When I try to feed vegetables to my children that they don't like, I try to claim they're something different than what they really are. But didn't the district court make a fact-finding here that neutrofine is, in fact, a hydrogen or hydrogen-reduced iron? Yes, Your Honor, it is a hydrogen-reduced iron, but it was, Hogan has specifically said that using the latest enrichment technology, they have been able to refine iron powder to a morphology and surface shape that was not previously possible. They also obtained a patent on it, Your Honor, which, in my view, shows it was not foreseeable. I'd like to also, with the court's permission, to move on to the SALT argument. Very briefly, the SALT argument in the construction by the district court was a dictionary definition, which is extrinsic evidence. The district court erred by going to extrinsic evidence rather than construing SALT as a substance that combines with moisture to form electrolyte, which malic acid undisputedly does. The manufacturer, Pactiv's Oxygen Absorber, has testified. What about the argument the counsel made, and from the record, that there was a specific disclaimer when the examiner said that your broader language was too broad and it was unacceptable, and you reduced it back to SALT? Because any disclaimer, Your Honor, was made in the grandparent application, the 375 pre-Donaldson, and the meaning of the word means changed between the 375 and the 872 patents, which was filed post-Donaldson. If Malteser had filed SALT means in the 872 patent, that would undoubtedly have been a narrower term than just SALT. Also, the manufacturer, Pactiv's Oxygen Absorber, called malic acid an acid salt, and that's on A3243 in their internal pricing sheets. With regard to the argument on false marking, Malteser was a private label manufacturer on the Oxygen Absorber. Malteser did not create the artwork. It merely put whatever artwork Pactiv wanted. The manufacturer of the current Oxygen Absorber has said the same thing. Pactiv controlled what went on that, so it was Pactiv's decision to mark that absorber. With a patent that AU did not cover. You just innocently and with an empty head went ahead and did that. I would perhaps disagree with the empty head, Your Honor, but we do have the affidavit of Tom Powers in the appendix saying that this was a private label process, and all we did was sell the Oxygen Absorber to Pactiv, and Pactiv then sold it to customers. It's a private label process. They choose what goes on the label, not Malteser. Also, the district court erred by not applying the rebuttable presumption of deceptive intent on the false marking claim. Pactiv knew that the 250 patent did not cover it, and that is enough to trigger the rebuttable presumption. The district court failed to apply the rebuttable presumption, and also quickly on the other counterclaim, the district court failed to consider the evidence proffered by Malteser regarding Pactiv's other wrongful conduct, which is telling customers that Malteser's Oxygen Absorber violated the FDA GRAS standards, and that using their absorber would be illegal. Okay. Thank both counsel. Case is taken under submission.